W. P. STOCKARD v. J. M. GRANBERRY et al. and
J. M. GRANBERRY v. W. P. STOCKARD et al.

1. SURETIES. *Not discharged by agreement for delay after judgment.* After
judgment an agreement between creditor and principal for delay, even
for a valuable consideration, will not discharge sureties, for the sure-
ties may have judgment over against the principal, and proceed to
make the money, notwithstanding the agreement between the creditor
and principal.

·2. SAME. *Are discharged when creditor obstructs their remedy.* But if, after
judgment and issuance of execution, the creditor takes a deed of trust
from the principal on his property, and includes other debts due him
and other persons, to be paid before the judgment, the sureties will be
discharged, for thereby he covers up the property of the principal and
obstructs the remedy of the sureties.

·3. STAYOR. *Entitled to same defense as sureties.* A stayor is a surety for the
payment of the judgment, and is entitled to the same defenses as the
sureties.

---

FROM MAURY.

---

Appeal from the Chancery Court at Columbia.    W.
·S. FLEMING, Ch.

E. C. MCDOWELL and A. L. DEMOSS for Stockard.

BARNETT & HUGHES for Granberry.

DEADERICK, C. J., delivered the opinion of the court.

In 1860 Granberry recovered, before a justice of
the peace of Maury county, fourteen judgments, aggre-
gating something upward of six thousand dollars, against
A. J., G. W. and L. J. Polk.    Complainant Stock-

ard became stayor of these judgments. In May, 1861, executions were issued upon them, but returned unsatisfied, probably by order of Granberry. On May 22, 1865, alias executions were issued upon said judgments and placed in the hands of deputy sheriff Ricketts for collection. Within ten days thereafter the deputy sheriff saw the Polks and informed them he would levy on their property as he was instructed to do by Granberry. It was proposed by the Polks or Granberry to execute a deed of trust to secure the debts. This proposition was accepted, and a few days thereafter two deeds of trust were executed, one by G. W. Polk and the other by L. J. Polk, to James H. Thomas, trustee, A. J. Polk having become insolvent; the deputy sheriff surrendered the executions to Granberry, and his costs were assumed by the Polks.

The deed of L. J. Polk provided for one-half of the fourteen judgments, and that of G. W. for the other half. Upon closing said trusts the half secured by Lucius J.'s deed was fully paid. That half included in said G. W. Polk's deed was not paid, nor any part thereof.

In 1872 Stockard filed his bill to enjoin the sale of his land, upon which Granberry had had *pluries* executions issued and levied, and returned for condemnation to the circuit court. He claims to be released from liability on said judgments on the ground that Granberry had not acted in good faith in ordering the return of the executions and procuring from the Polks a conveyance of all their property in trust to secure other debts, besides the fourteen judgments, due to him-

self and others; and that said trust deed of G. W. Polk as to one-half of said judgments postponed them to other large debts, and nothing was realized to be applied to them.

As no question of practical importance arises upon the deed executed by L. J. Polk, it is needless to further consider its provisions, except to say it se-cured other debts than the half of said judgments.

In regard to the deed of G. W. Polk, it conveyed all his real estate except, as he stated on his exami-nation as a witness, a small tract of land of compar-atively small value in Dyer county, Tennessee, and a tract of land in Arkansas. It also conveyed, as we infer, all his personal estate, including knives and forks, etc. So that while he had a very valuable real and personal estate in Maury county up to the time of the execution of his trust deed, subject to execution at law, after that he had no property in said county which could be reached by execution. The first debts secured are fourteen judgments due Granberry, and re-covered in January, 1861, each for from $469 to $475. The next are notes and claims of the Bank of Ten-nessee, number and amounts not given, upon which his brother, Lucius J., is security. The next claim to be paid is a note to Andrew Erwin, guardian, for $5,000; the next is a debt to Isaac H. Hilliard, in the sum of $15,000; the next is a debt to James J. Bryant, of about $1,200; the next is a medical bill to complainant, Stockard, amount not given. Then follows, as the 7th in the order of payment to be made, the one-half of the said fourteen judgments due

Granberry.   The next claim is a note to S. W. Fitz-
patrick for about $3,500; then a note to Morgan
Fitzpatrick for about $4,200.   Then follows the last
of his debts mentioned and intended to be secured, evi-
denced by three notes, aggregating about $680, and
due to James Aiken.

The deed provides that if said George W. shall
pay the foregoing debts on the first of June, 1866,
the trustee shall reconvey the same, and stipulates that
the property shall remain in the grantor's possession
until it is necessary to sell the same, unless the trus-
tee should think it best for those interested that he
should take possession of the same.   The debts were
to be paid in the order named, from which it will
appear that a large amount was preferred to the half
of the fourteen judgments therein mentioned.

Granberry filed a cross-bill seeking to have Stock-
ard's land, consisting of a house and lot of several
acres, sold for the satisfaction of the unpaid half of
the said fourteen judgments.   The pluries executions
had been issued and levied upon said house and lot
in 1870.   The said executions had been returned to
the circuit court for condemnation of the land, and
the same were still pending when the original bill was
filed in this case.

Stockard answered Granberry's cross-bill, insisting
he should not be held liable, avering, as he had done
in his bill, that the executions in the hands of Rick-
etts, deputy sheriff, had been placed there by Gran-
berry with instructions to make the money; that he
was so informed by Granberry while Ricketts had the

executions in his hands, and he had no information or knowledge of a return of said executions without levy, or taking of the trust deed until sometime after it was done, when he expressed his dissatisfaction, but was assured by Granberry 'that the deed made the debt safe.

In 1874 Stockard died, having first made his will, in which he devised said house and lot to his niece, Mrs. Beech, and made other devises and ' bequests. Mrs. Beech and her husband, and the administrator of Stockard, were made parties to the suit, Beech and wife claiming that the personal estate of Stockard, if he should be held liable, should first be applied to pay the said judgments. And it appeared that the administrator of Stockard had suggested to the county court the insolvency of his estate.

The chancellor decreed in favor of Granberry for $6,302.32, to be paid first out of the personal estate, and next for any balance out of the house and lot, and lastly, to the extent of $5,000, the penalty of the bond against the surety of Stockard on his injunction bond for any balance. Stockard's administrator and Beech and wife appealed.

The liability of Stockard's estate. depends upon the question whether Granberry's interference with the officer having the executions, and his taking a deed of trust for the judgments and other debts, was an act of bad faith, and prejudiced the rights of Stockard. Although there was no express stipulation in the deeds for delay, Ricketts, the deputy sheriff, and George W. Polk, testify that it was understood between the par-

ties that the Polks were not to be pressed if the deeds were executed., But even if such contract for delay had been made between the creditor and principal debtor, this of itself, after judgment, would not release their surety or stayor, who is also a surety, because such surety has the right to judgment against his principal, notwithstanding such agreement for delay. This has been held in numerous cases upon the ground that such delay does not deprive the surety of the means of protecting himself against the payment of the debt. He may obtain judgment and have execution levied on the property liable to the suspended execution of the creditor, and for this reason it has been said a surety has his remedy in his own hands after judgment. The reason why a surety after judgment, or stayor, is not released by extention of time to principal debtor, or by the return of execution without levy by order of creditor, although such principal debtor had ample property liable to execution is, that the surety may have such process in his own behalf, and may levy on the principal debtor's property.

But while it is well settled that mere indulgence or delay on the part of the creditor to collect his debt off of his principal debtor will not release the surety or stayor, because such delay or indulgence is not regarded as doing the surety or stayor any injury, yet the utmost good faith and fair dealing by the creditor toward the surety is required, and if he does any act injurious to him, or omits to do what his duty to him requires he should do, whereby he is injured, he will be discharged from his liability.

43—VOL. 3.

This record shows that from the time of the rendition of said fourteen judgments, the Polks had ample property subject to execution, out of which they might have been satisfied. This fact was well known to Stockard, and when the execution in 1865 had been issued for the second time, he was informed by Granberry that the money should be collected on them. They were in the hands of the deputy sheriff, who ·says he could and would have made the money on them but for the fact that Granberry ordered him to ·surrender them or return them, when he was about to levy them. This he did do at the same time at which the deeds of trust were taken, without the knowledge or consent of Dr. Stockard.

While the simple return of the executions without levy would not discharge the surety, we are of opinion that Granberry, by taking the trust deed and consenting that these debts or judgments should be postponed to numerous other large debts of Polk's (after promising not to press the collection of the said judgments), whereby the whole of the property was exhausted, and said judgments left unprovided for, did not act with that perfect good faith toward Stockard which the law required of him, and so misled him as to prevent his taking measures for his own protection. The officer had the executions, and was about to levy them on property ample for their satisfaction. Stockard knew this, and had a right to rely upon the consummation which Granberry had promised. But the officer was ordered to return the executions, and at the same time the creditor accepts deeds of trust from

the Polks, conveying all their property, securing first another large indebtedness to himself, and then other large debts to others, and consented to have these fourteen judgments, which were so near being satisfied, among the last debts to be paid, and in fact after foreclosure not a dollar was realized which, under the terms of the trust, could be applied to said judgments. So that although the mere indulgence may be said not to have operated to the injury of the surety, yet the indulgence and the simultaneous swallowing up of all the property of the debtors, thus putting it out of the power of the stayor to avail himself of his right of self-protection, was an injury done to the surety by the creditor. He knew that these executions were about to be levied on this property, and yet he forbids the levy and accepts and agrees to conveyances of this same property to secure other debts due to himself in part, and also to third persons, whereby nothing was left, either in the deed or out of it, which could be applied to the fourteen judgments.

Granberry says he notified Stockard that he was going to take a deed of trust to secure said judgments, a few days before it was done, and that when said deeds were taken he endeavored to have said fourteen judgments placed in the first class, as his other claims were. But Stockard denies that Granberry gave him any such notice, and neither G. W. Polk nor the officer knew of any such notice, and it does not appear that he had notice until sometime after the deeds were executed. And G. W. Polk

says if there had been a proposition to place the fourteen judgments in the list of debts of the first class, he knows of no reason why he should have opposed it. On these judgments the executions issued, and the deed of trust was made upon condition that they should be held up and not pressed, and yet they are so placed in the deeds as that not a dollar could be made available toward their payment.

In an unreported case, of *Bryant* v. *Killough*, decided at Brownsville, April term, 1868, it was held, Judge Smith delivering the opinion, that when the stayor urged the officer having the execution to make the money out of the principal debtor, and the principal debtor, on his applying to him for property, showed him a tract of land of value sufficient to pay the debt, and the creditor told the officer not to levy on the land, and the debtor afterward became insolvent, that the stayor was discharged. This case is not in accord with previous or subsequent decisions of this court.

The stayor there might have obtained his judgment against his principal, and thus have protected himself. The distinction between that case and others in which relief has been refused to stayors and sureties after judgment and this case is, that the creditor did no injury to the surety by simply refusing to levy, whereas by refusing to levy himself, and by aiding in placing the property of his debtor out of the reach of the surety and for the benefit of third persons, he renders unavailing any measures the surety might adopt for his protection. He has, by his active interposition

between his debtor's property and his stayor's remedy, prevented the stayor from enforcing the payment of the debt which he has himself refused to collect by executions, which the surety had reason to believe would be used to collect the debt and relieve him from further liability.

In Freeman on Judgments, sec. 226, it is said that the preponderance of authorities is decidedly in favor of the rule that the creditor, after judgment, can give the principal debtor no preference, nor do any act by which the liability of the surety is increased, and that such acts as discharge the surety before judgment will discharge him after judgment. But in Tennessee the rule is different, for while a valid contract for delay between creditor and his principal debtor before judgment will discharge a surety, such a contract after judgment will not. 3 Sneed, 541; 10 Yer., 111, 362; 10 Hum., 447; 3 Hum., 412, 553; 5 Hum., 320; 9 Hum., 493; 5 Hum., 249. The reason given for the discharge before judgment is that the surety could only have the same equities against the principal that the creditor has, and if the creditor had bound himself for delay by a valid contract, the surety would be bound also, whereas after judgment the surety may obtain judgment against his principal, notwithstanding the contract between creditor and principal (3 Hum., 412, 545), and for this reason it is supposed the agreement to delay does the surety no harm (10 Yer., 111), and because it does him no harm he is not discharged. It is said, 3 Hum., 413, the surety's remedies against his principal were not

lessened or obstructed by agreement for delay after judgment. A stayor is a surety for the payment of the judgment, and by our statutes is entitled to the same defenses as other sureties. But if the creditor does or omits to do any act injurious to the surety, or inconsistent with his rights, he will be discharged. 3 Hum., 543, citing 1 Story Eq., secs. 325 and 326. If he does any act obstructing the surety's remedy, it is said by implication in 3 Hum., 413, the surety would be released. If he has not only suspended the execution about to be levied on the debtor's property, which would have satisfied the debt, after telling the surety he would levy on it, and then, without the knowledge of the surety, puts the creditor's property out of the reach of the surety for the benefit of third persons, it would seem he had thus effectually obstructed the surety's remedies. The act is necessarily and irreparably injurious. Mere delay would not have been, nor delay for a valid consideration, but the making away with all the debtor's property was an injury and an injustice to the surety. The cases cited upon which the distinction is founded between the surety's rights before and after judgment, refer to delay extended to debtor. But none of these cases excuse any act of the creditor injurious to the surety after judgment any more than before. But they all assume giving time merely after judgment is not injurious.

We are, therefore, of opinion, from the facts disclosed in this record, that Granberry's acts in placing Polk's property beyond the reach of executions, and

State *v.* Duncan.

suspending his executions, were injurious to Stockard, and that it would be inequitable to hold his property liable to pay a debt which would have been paid but for the act of the creditor. Good faith required of him that he should not put the surety in a worse condition than he was in before the return of the execution, and that he should not make, by his voluntary act, the remedy the law gave him wholly unavailing, if he himself refused to levy the executions which he had promised to do.

The Chancellor's decree will be reversed, and the injunction against the collection of the said fourteen judgments, or any part thereof, from the estate of Stockard, will be made perpetual. The cross-bill is dismissed.